

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

RICHMOND DIVISION

|  |  |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>JAELIN RANDALL,<br><br>*Defendant*. | Case No. 3:26-cr- 72<br><br>18 U.S.C. § 1956(h)<br>Money Laundering Conspiracy<br>(Count 1)<br><br>Forfeiture Allegation |

## CRIMINAL INFORMATION

THE UNITED STATES CHARGES THAT:

### GENERAL ALLEGATIONS

At all times relevant to this Criminal Information:

1.     CC-1 was employed by the Richmond City Fire Department in Richmond, Virginia, within the Eastern District of Virginia, as an Administrative Project Analyst (Procurement Officer) from 2012 to 2025.  As the Fire Department's Procurement Officer, CC-1 was responsible for purchasing equipment and services to support the Fire Department's emergency response operations.  Before his employment with the City of Richmond, CC-1 retired from the United States Navy in 2010 as a Senior Chief Petty Officer.

2.     Beginning in or about 2017, CC-1 began embezzling funds from the Fire Department by facilitating payments to sham vendors that were owned and controlled by CC-1's friends and family members.  At CC-1's direction, the co-conspirators submitted fabricated quotes and invoices to CC-1 at the Fire Department, collected fraudulent proceeds from the City of Richmond, pocketed some of the proceeds for their personal benefit, and returned a portion of the

proceeds to CC-1 to promote and conceal the scheme and for CC-1's personal benefit. Despite creating hundreds of fabricated quotes and false invoices on behalf of the sham vendors, the co-conspirators did not provide any legitimate services or goods to the City of Richmond or the Fire Department.

3. CC-2 was responsible for the sham vendor RPM Supply Co., LLC ("RPM"). CC-1 and CC-2 were married and resided together in a single-family residence in Henrico, Virginia. CC-2 organized RPM in September 2017 in Virginia and listed the company's principal office address as her and CC-1's personal residence. CC-2 was enlisted in the United States Navy and most recently held the rank of Master Chief Petty Officer.

4. CC-3 and CC-4 were jointly responsible for the sham vendors McCoy & Ambrose LLC and J&E Enterprise of Virginia LLC ("J&E"). CC-3 and CC-1 met while serving together in the United States Navy in the 1990s. CC-3 is a close family member of CC-4. For a portion of the scheme, CC-3 and CC-4 resided together in Dumfries, Virginia at the same address they used to registered McCoy & Ambrose and J&E.

5. CC-5 was responsible for the sham vendor ERA ErrandRunningAssistants LLC ("ERA"). CC-5, who resided in Woodbridge, Virginia, was introduced to CC-1 by CC-4.

6. The defendant, JAELIN RANDALL, was responsible for the sham vendor T.o.L. LLC. RANDALL lived in the Atlanta, Georgia area, and he is CC-1 and CC-2's nephew. RANDALL served in the United States Navy Reserve as a Petty Officer Second Class.

7. For purchases equal to or less than $10,000, CC-1 had authority to use his City of Richmond-issued Purchasing Card ("P-Card") to make payments on behalf of the Fire Department.

8. For larger purchases, City of Richmond policy required CC-1 to submit requests for quotations ("RFQs") to multiple vendors that were registered with the city. CC-1 was

2

responsible for selecting the vendor that provided the lowest quote and for facilitating payment from the City of Richmond to the vendor.

## COUNT ONE
(Money Laundering Conspiracy)

9.      Beginning in or about September 2017, the exact date being unknown, and continuing through in or about April 2025, in the Eastern District of Virginia and elsewhere, the defendant JAELIN RANDALL, and others known and unknown, willfully and knowingly conspired and agreed to commit certain offenses under Title 18, United States Code, Section 1956, that is:

a.      to knowingly engage and attempt to engage, in monetary transactions by, through or to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, that is, the negotiation of a cashier's check on or about September 24, 2024 in the amount of $28,320.80, among other such transactions, such property having been derived from a specified unlawful activity, that is, wire fraud in violation of Title 18, United States Code, Section 1343, and conspiracy to commit wire fraud in violation of Title 18, United States Code, Section 1349, in violation of Title 18, United States Code, Section 1957.

## MANNER AND MEANS

10.     The preceding paragraphs are incorporated herein.

11.     CC-1 initiated fraudulent transactions by sending RFQs via email to a group of recipients comprised of both sham vendors and legitimate vendors.  At CC-1's direction, the co-conspirators, including RANDALL, submitted fabricated quotes on behalf of their respective sham vendors for goods and services to the Richmond City Fire Department to CC-1.  On occasion, the

3

co-conspirators manipulated their quotes to ensure that a particular sham vendor would provide the lowest bid in response to an RFQ.

12.    Following the RFQ process, CC-1 selected a co-conspirator's sham entity as the winning vendor. CC-1 then caused the City of Richmond to issue payments to the sham vendors controlled by the co-conspirators based on the fraudulent quotes and invoices.

13.    The co-conspirators, including RANDALL, also caused the City of Richmond to issue fraudulent payments using CC-1's P-Card. The co-conspirators, including RANDALL, manually entered CC-1's P-Card information into a payment processing platform such as Square to obtain payment from the City of Richmond to an account controlled by the co-conspirator. Many of these fraudulent transactions were in amounts just below the City of Richmond's $10,000 limit for P-Card purchases.

14.    After receiving fraudulent proceeds—via either the RFQ or the P-Card process— in bank accounts held by T.o.L., RANDALL directly and indirectly transferred a portion of those funds to CC-1. On occasion, RANDALL made large cash withdrawals of fraud proceeds and provided CC-1 with cash. On other occasions, RANDALL directly and indirectly transferred fraud proceeds from T.o.L. to yet another sham entity owned and controlled by CC-1 for the purpose of "layering" and further concealing and disguising the fraudulent nature and source of the proceeds. CC-1 periodically drove from the Richmond, Virginia-area to Georgia to meet RANDALL to collect the cash and cashier's checks comprising the fraud proceeds.

15.    For example, on or about September 16, 2024, the co-conspirators fabricated a quote from T.o.L. to provide hazardous waste disposal services to the City of Richmond for over $46,000. In truth and in fact, T.o.L. never provided any hazardous waste disposal services to the City of Richmond; T.o.L. was not qualified to, and had no experience with, disposing hazardous

waste. Nevertheless, CC-1 used his authority within the City of Richmond to cause the city to pay $46,832.70 to a T.o.L. business account held by Square, Inc. (the "T.o.L. Square Account") on or about September 19, 2024, for the purported waste disposal services. RANDALL was the sole signatory on the T.o.L. Square Account. From the T.o.L. Square Account, RANDALL immediately transferred a total of $41,270.80 in two transactions (one $12,950 transfer and another $28,320.80 transfer) to a separate T.o.L. business account held at Chase Bank (the "T.o.L. Chase Account"). RANDALL was also the sole signatory on the T.o.L. Chase Account. From the T.o.L. Chase Account, RANDALL transferred $12,450 of the fraud proceeds to his personal checking account at Chase, which RANDALL used to make expenditures for his personal benefit. RANDALL also dispensed fraud proceeds from the T.o.L. Chase Account by obtaining a $28,320.80 cashier's check payable to Sworn Shield Solutions on or about September 24, 2024. Sworn Shield Solutions LLC was a sham entity that CC-1 organized in Wyoming on or about September 3, 2024. CC-1 deposited the $28,320.80 cashier's check into a Sworn Shield Solutions business account at Wells Fargo Bank, on which CC-1 was the sole signatory, on or about September 30, 2024. On or about October 4, 2024, CC-1 used $19,000 of the fraud proceeds from the Sworn Shield Solutions account toward purchasing a vehicle for CC-1's personal benefit.

16. By way of another example, on or about April 14, 2023, RANDALL and CC-1 conspired to use CC-1's City of Richmond P-Card to make a $7,693.18 payment to T.o.L, to purportedly purchase equipment for the Fire Department's Water Rescue Unit. The co-conspirators fabricated an invoice that purported to reflect T.o.L.'s provision of 32 "Zennith Air CL Helmet[s] (HiViz Lime)" and two "Standard Propeller[s] 5 SP Kits" to the Fire Department. In truth and fact, T.o.L. never provided any such goods to the City of Richmond or the Fire Department. RANDALL executed the transaction by manually entering CC-1's P-Card

5

information and payment amount into T.o.L.'s Square account. After the transaction processed, RANDALL emailed CC-1 a screenshot of information related to the transaction from T.o.L.'s online account information at Square. RANDALL explained, "Here is the gross and net. With the fees that square took out." The screenshot showed the $7,693.18 gross payment and a net deposit to T.o.L. of $7,423.77. On or about April 20, 2023, RANDALL transferred the fraudulent proceeds to RANDALL's personal checking account at Navy Federal Credit Union ("NFCU"). Over the next week, RANDALL made four ATM cash withdrawals totaling $4,720 from his NFCU account. RANDALL transferred a portion of the proceeds to CC-1 and retained the remaining portion for his personal benefit.

17.    In total, T.o.L. received 17 fraudulent payments totaling more than $340,000 from the City of Richmond between April 2023 and January 2025. For purposes of United States Sentencing Guidelines § 2B1.1(b)(1), RANDALL reasonably foresaw a loss amount exceeding $250,000 and less than $550,000.

18.    In early 2025, auditors working for the City of Richmond began investigating CC-1's expenditures to sham vendors. In response, CC-1 created a "burner" email account, bondjamesii1207@gmail.com, under the pseudonym "Jamie Bond," and used that email account to communicate with co-conspirators. On or about February 3, 2025, CC-1, posing as "Jamie Bond," directed RANDALL via email to lie to investigators: "if they ask how i send you request for quotes tell them it varies email, fax, scans etc… if they ask you my number it's ***-***-8778. If they ask how often you call me just say only if you don't understand something or to return my call. If they ask how we met, just tell them you had a vendor table at the Charlotte DEI conference about three years ago." When interviewed by federal agents in February 2026, RANDALL initially followed CC-1's instructions by, for example, falsely stating RANDALL met CC-1 at a

procurement conference, but RANDALL ultimately provided truthful information to the agents and acknowledged the scheme.

(In violation of 18 U.S.C. § 1956(h).)

## FORFEITURE ALLEGATION

Pursuant to Rule 32.2(a) Fed. R. Crim. P., the defendant is hereby notified that upon conviction of the offense listed in Count One of this Criminal Information, the defendant shall forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property.

If property subject to forfeiture cannot be located, the United States will seek an order forfeiting substitute assets.

(In accordance with Title 18, United States Code, Section 982(a)(1) and Title 21, United States Code, Section 853(p)).

Respectfully submitted,

Todd W. Blanche
Acting Attorney General

Date:   June 23, 2026              By:   _____
                                         Robert S. Day
                                         Assistant United States Attorney

                                   For _____
                                         Thomas A. Garnett
                                         Assistant United States Attorney

7